In re JONES TRUCK LINES, INC., an Arkansas Corporation, Debtor.

JONES TRUCK LINES, INC., Plaintiff,

v.

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; Central States, Southeast and Southwest Areas Health and Welfare Fund; Corestates Bank, N.A. as Lender and as Agent for Midlantic National Bank, Continental Bank, and Wilmington Trust Company, Defendants.

Bankruptcy No. 91–15475M.
Adversary No. 92–8527.

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

Sept. 27, 1995.

Isaac A. Scott, Charles T. Coleman, Kimberly Wood Tucker, Wright, Lindsey & Jennings, Little Rock, AR, for Jones Truck Lines, Inc.

Jill R. Jacoway, Jacoway Law Firm, Fayetteville, AR, for Defendants.

James P. Condon, Thomas C. Nyhan, Central States Funds, Rosemont, IL. Audrey R. Evans, Lax, Vaughan, Pender & Evans, Little Rock, AR, for the Creditors' Committee.

Charles Tucker, U.S. Trustee, Little Rock, AR.

## MEMORANDUM OPINION

JAMES G. MIXON, Chief Judge.

On July 9, 1991, Jones Truck Lines, Inc. (Jones) filed a voluntary petition for relief under the provisions of Chapter 11 of the United States Bankruptcy Code. Simultaneously, with the filing of the bankruptcy petition, the debtor ceased its operations and began the process of self-liquidation. On April 30, 1992, Jones filed a complaint against Central States Southeast and Southwest Areas Pension Fund and Central States Southeast and Southwest Areas Health and Welfare Fund (collectively Central States) to recover preferential transfers made within ninety days of the petition date totalling $5,743,491.61 and to set aside as a preferential transfer a lien on Jones' assets granted to Central States by Jones during the preference period. On September 26, 1994, a trial was held in Fayetteville, Arkansas, and at the conclusion of the hearing the matter was taken under advisement.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) (1988), and the Court has jurisdiction to enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

There are several issues at dispute in this proceeding. The first issue is whether the payments Jones made to Central States are preferential transfers under the provisions of 11 U.S.C. § 547 (1994). If so, Central States argues that the preferential transfers cannot be avoided due to the affirmative defenses provided for in 11 U.S.C. § 547(c)(1)–(4) (1994). In addition, there is an issue of whether the security interest granted by Jones in favor of Central States should be avoided under the provisions of 11 U.S.C. § 547(b) (1994). Each of these issues will be discussed separately below.

## I

### BACKGROUND

For many years Jones operated a trucking business from its headquarters in Springdale, Arkansas. Jones operated as a less-than-truckload motor carrier and, at the time Jones filed its bankruptcy petition, it employed approximately 3200 employees, most of whom were members of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of American Labor Union (Teamsters Union). Since 1955, Jones had been obligated under various collective bargaining agreements with the Teamsters Union to make contributions to Central States.

Central States operates a multi-employer employee benefit plan that provides health, welfare, and pension benefits for employees covered by collective bargaining agreements entered into from time to time by the Teamsters Union and various employers. The collective bargaining agreement that was effective between Jones and the Teamsters Union was referred to as the national master freight agreement. At the time of the filing of the bankruptcy petition, Jones was one of the largest contributors to Central States, with 2300 of its union employees being participants in Central States' funds.

Jones made payments to two separate funds, the health and welfare fund and the pension fund. Pursuant to the national master freight agreement, Jones became liable to pay the health and welfare fund the sum of $104.70 for "each week in which a regular employee works or is compensated at least two (2) days or tours of duty in the contribu-

tion week. For regular employees who work or are compensated one (1) day or tour of duty in the contribution week," Jones became liable to pay the health and welfare fund the sum of $34.00. Pursuant to the national master freight agreement, Jones became liable to pay the pension fund $16.60 "per day or tour of duty either worked or compensated," to a maximum of $83.00 per week, "for each regular employee covered by this Agreement who has been on the payroll thirty (30) days or more."

Prior to January 1991, Jones computed the amount of contributions due to Central States by the Tuesday following the work week in question. Jones collected the information, entered the data on a magnetic tape, and transmitted the magnetic tape to Central States during the second or third week of the month following the month being reported. Jones also forwarded the amount due for the previous month by wire transfers to two different accounts at Harris Trust Savings in Chicago, Illinois. Pursuant to the participation agreements, payments were considered delinquent if not received by Central States by the fifteenth day of the month following the month in which the employees' services were rendered.

In January 1991, Jones failed to make the required payment due for the month of December, 1990. Jones did make a partial payment of $300,000 on or about January 18, 1991. As of the January 18th payment, Jones had accrued an arrearage in excess of $2 million for the month of December 1990 for the health and welfare and pension funds combined, and had accrued a liability for the first three weeks of January 1991.

Peter Priede (Priede), the group manager of operations accounting for Central States for both funds, testified on behalf of Central States. He participated in negotiations with Jones which ensued after Central States received the $300,000 partial payment instead of the full amount due on January 15th. After receipt of the partial payment, Priede attempted to contact officers of Jones and, after several unsuccessful attempts, he wrote a letter dated January 28, 1991, to P. Elliot Burnside, president of Jones. The letter provided, in part, as follows:

> This is to advise you that unless full payment is received by the Funds or you

contact me to make arrangements to the Funds' satisfaction by Wednesday, January 30, 1991, we will have no choice but to file a lawsuit in Federal District Court. Should this action be necessary, please be advised that in addition to the above amounts we will seek additional amounts owed the Funds, including but not limited to, the greater of 20% of the delinquent amount owed or a doubling of interest as well as attorneys fees and related costs. Please contact me by January 30 as it is our desire to reach an amicable resolution. However, should this not be possible the Funds will not hesitate to take the appropriate action to protect its interests.

Paul Shiffler (Shiffler), senior vice president of finance of Jones, wrote a letter to Priede dated January 31, 1991, and requested to meet with Priede in Chicago to discuss Jones' financial condition. The meeting in Chicago was attended by Shiffler and Ivan Crook, on behalf of Jones, and Priede and Tom Nyhan, general counsel of Central States, on behalf of Central States. Shiffler advised Priede of Jones' cash flow problems and stated that certain steps were being taken to improve the situation. Shiffler told Priede and Nyhan that Jones needed Central States to allow it more time to make the December contributions. Priede suggested that Jones begin making weekly payments to cover the accruing liability to prevent the arrearage from increasing.

The parties agreed that Jones would make estimated payments on each Friday and by the 15th of the following month actual accruals would be computed for the entire preceding month and any adjustment would be made at that time. The estimated payments were to be in the sum of $425,000 per week for both funds combined. Several other issues were addressed during the negotiations and draft documents were exchanged between the parties. The draft term sheet exchanged between Shiffler and Priede reflected a proposal to defer the payment of (1) the remaining January 1991 payment, which represented the liability accrued in December 1990, in the approximate amount of $1.7 million; (2) the February 1991 payment, which represented the liability accrued in January 1991, in the approximate amount of $1.7 million; and (3) a portion of the March 1991 payment, which represented the liability to be accrued during the first part of February 1991 in the amount of $500,000. According to the draft term sheet, the deferred amount was to be paid "in equal weekly payments over the next 12 months beginning in July 1991."

The draft term sheet also provided for the acceleration of future payments. The proposal provided:

all liability to Fund for periods after February 1 to be settled each week as incurred (wire transfer each Friday of such week). During February there will be a step up period to full payment as follows:

| week ending | 2/8 | $200,000 |
| " | 2/15 | $200,000 |
| " | 2/22 | $425,000 (Approx) |
| • | | |
| • | | |
| • | | |
| All subsequent weeks until deferral is repaid | | $425,000 (Approx) |

The minutes of the funds' board meeting held on February 22, 1991, reflect that Central States' board approved the above-stated proposal by a unanimous vote.

The terms of the final agreement were ultimately different from the proposals. Jones made the two $200,000 payments on February 8 and February 15, 1991, respectively. The parties agreed that the amount of deferral would be the sum of $2,885,765.48. This amount represented Jones' actual accrued liability to Central States for employee services performed from November 29, 1990, through January 24, 1991, less a $300,000 payment in mid-January 1991, and less two $200,000 payments made in February 1991, plus interest from mid-January until approximately February 22, 1991. The $2,885,765.48 amount was also the "net unpaid balance" reflected on Central States' monthly billing statement prepared on February 22, 1991. Pl.'s Ex. 41.

The deferred amount was reduced to two promissory notes dated May 7, 1991, in the principal sums of $1,427,040.68 and $1,458,724.80. Interest on the notes was to be paid "each calendar week, on or prior to the Friday of each week, commencing with the first Friday after the date hereof and ending on Friday March 27, 1992." The notes provided for payments of principal and interest to

begin April 3, 1992. In addition, Central States was to be granted a lien on Jones' assets to secure Jones' obligation to pay the two promissory notes and the accruing current liability. All the legal documents evidencing the agreement were executed May 7, 1991.

On February 25, 1991, Jones began making weekly payments in the sum of $425,000. Central States, in its answer to interrogatories, described the nature of the $425,000 weekly payments as follows:

> These weekly payments were intended by the parties to approximate Jones' weekly obligations to Central States that were then accruing under Jones' collective bargaining agreements, and Central States so applied each such weekly payment to Jones' weekly obligations. However, because the payments of $425,000 per week were an approximation of Jones' weekly obligation, and the exact amount of Jones' obligation could not be known until Jones reported its employment levels to Central States at the end of each calendar month, Central States continued to submit monthly billing statements to Jones.... Under the arrangement between the parties instituted in February of 1991, any such shortfall in the weekly payments made during a given calendar month was to be made up in a payment to Central States by the 15th of the following month.

The following is a listing of the payments Jones made to Central States:

| Payment Date | Amount of Payment |
|---|---|
| February 25, 1991 | $425,000.00 |
| March 1, 1991 | 425,000.00 |
| March 8, 1991 | 425,000.00 |
| March 15, 1991 | –0– |
| March 22, 1991 | 425,000.00 |
| March 29, 1991 | 425,000.00 |
| April 5, 1991 | 425,000.00 |
| April 12, 1991 | 425,000.00 |
| April 19, 1991 | 425,000.00 |
| April 26, 1991 | 425,000.00 |
| May 3, 1991 | 425,000.00 |
| May 10, 1991 | 425,000.00 |
| May 15, 1991 | 532,692.50 |
| May 24, 1991 | 425,000.00 |
| May 31, 1991 | 425,000.00 |
| June 7, 1991 | 425,000.00 |
| June 14, 1991 | 477,146.32 |
| June 21, 1991 | 425,000.00 |
| June 28, 1991 | 425,000.00 |
| July 5, 1991 | 425,000.00 |

Jones' actual accrued liability to Central States was as follows:

| Period of Accrual | Actual Amount Accrued |
|---|---|
| Jan 27 – Feb 2 | $386,754.67 |
| Feb 3 – Feb 9 | 386,754.67 |
| Feb 10 – Feb 16 | 386,754.67 |
| Feb 17 – Feb 23 | 386,754.67 |
| Feb 24 – Mar 2 | 384,917.12 |
| Mar 3 – Mar 9 | 384,917.12 |
| Mar 10 – Mar 16 | 384,917.12 |
| Mar 17 – Mar 23 | 384,917.12 |
| Mar 24 – Mar 30 | 384,917.12 |
| Mar 31 – Apr 6 | 434,022.05 |
| Apr 7 – Apr 13 | 434,022.05 |
| Apr 14 – Apr 20 | 434,022.05 |
| Apr 21 – Apr 27 | 434,022.05 |
| Apr 28 – May 4 | 438,036.58 |
| May 5 – May 11 | 438,036.58 |
| May 12 – May 18 | 438,036.58 |
| May 19 – May 25 | 438,036.58 |
| May 26 – Jun 1 | 438,330.96 |
| Jun 2 – Jun 8 | 438,330.96 |
| Jun 9 – Jun 15 | 438,330.96 |

The May 15, 1991, payment included the estimated payment of $425,000.00, as well as an additional amount of $107,692.00. This additional amount was made to compensate the funds for the accrued shortfall resulting from the failure of Jones to make the March 15 estimated payment of $425,000.00 and the shortfall for the weeks the actual accrued liability exceeded the estimated payment. Payments made from February 25 through May 15 totalled $5,207,692.50 and the total amount of actual accrued liability from January 27 through April 27 was $5,207,692.48.

The June 14, 1991, payment included the estimated payment of $425,000.00, as well as the additional amount of $52,146.32. This additional amount was made to compensate the funds for the accrued shortfall resulting from the amount by which the actual accrued liability from April 28 through May 25 exceeded the estimated payments made for this time period. The total amount of payments made from May 24 through June 14 was $1,752,146.30 and the total amount of actual liability from April 28 through May 25 was $1,752,146.26.

In addition to the weekly payments listed above, Jones made the following payments of interest due on the promissory notes:

| Date of Payment | Payment Amount |
|---|---|
| May 24, 1991 | $11,783.54 |
| May 31, 1991 | 6,299.05 |
| June 7, 1991 | 6,027.52 |
| June 14, 1991 | 6,027.53 |
| June 21, 1991 | 6,162.53 |
| June 28, 1991 | 6,027.52 |
| July 5, 1991 | 16,325.10 |

The total amount of payments to the funds, including interest, made during the preference period between April 10, 1991, and July 8, 1991, was $5,743,491.61.

## II

### PREFERENTIAL TRANSFERS

A. *Payments to Central States' Funds*

██ Jones alleges that the payments it made to Central States' health and welfare fund and pension fund during the ninety days before the bankruptcy petition was filed constitute preferential transfers and should be avoided under 11 U.S.C. § 547(b) (1994).

Section 547(b) of the Bankruptcy Code provides as follows:

[T]he trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1994). Jones has the burden of proving the avoidability of a preferential transfer. 11 U.S.C. § 547(g) (1994).

Central States argues that the weekly estimated payments of $425,000.00 were not payments on an antecedent debt. Central States argues that the parties' agreement allowed Jones until the 15th day of the month following the previous month's accrual before Jones would become a "delinquent employer." Central States argues that under the parties' agreement Jones was not legally bound to pay the contributions until the 15th day of the month following the accrual and therefore the liability accrued on the 15th day of the month following the accrual.

██ Central States' argument is not persuasive and is not supported by prevailing legal authority. A debt for purposes of section 547 is antecedent if it is "incurred before the transfer." 4 *Collier on Bankruptcy* ¶ 547.05 (Lawrence P. King et al, eds., 15th ed. 1995). A debt is incurred when a debtor becomes legally bound to pay. *Iowa Premium Serv. Co. v. First Nat'l Bank (In re Iowa Premium Serv. Co.)*, 695 F.2d 1109, 1112 (8th Cir.1982). The Bankruptcy Code defines a "debt" as a "liability on a claim." 11 U.S.C. § 101(12) (1994). A claim is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A) (1994). Under this broad definition, Central States acquired a claim against Jones as soon as the liability accrued under the national master freight agreement. *Sigmon v. Royal Cake Co. (In re Cybermech, Inc.)*, 13 F.3d 818, 822 (4th Cir.1994) (holding that creditor had claim even though cause of action for payment had not accrued); *In re Iowa Premium Serv. Co.*, 695 F.2d at 1112 (applying same analysis in construing when a debt is incurred for purposes of now repealed section 547(c)(2) (45–day rule)). Central States' theory would restrict the definition of a claim to a matured, liquidated debt, which is contrary to the applicable provisions of the Bankruptcy Code.

Pursuant to the national master freight agreement, Jones became liable to pay the health and welfare fund the sum of $104.70 for each week in which a regular employee works or is compensated at least two (2) days or tours of duty in the contribution week. For regular employees who work or are compensated one (1) day or tour of duty in the contribution week," Jones became liable to pay the health and welfare fund the sum of $34.00. Pursuant to the national master

freight agreement, Jones became liable to pay the pension fund $16.60 "per day or tour of duty either worked or compensated," to a maximum of $83.00 per week, "for each regular employee covered by this Agreement who has been on the payroll thirty (30) days or more." Therefore, the evidence establishes that all payments to the funds were made on account of antecedent debts.

The parties stipulated at trial that Jones was insolvent at the time the transfers were made. Central States makes no argument that the remaining elements of a preference were not established. The transfers were of an interest of Jones in property, to or for the benefit of Central States, for or on account of an antecedent debt owed by Jones before such transfers were made and made while Jones was insolvent. The transfers were made within ninety days before the petition was filed and enabled Central States to receive more than it would receive if this were a case under Chapter 7 of the Bankruptcy Code. Therefore, Jones has met its burden of proving that all the elements of a preferential transfer are present as to the payments Jones made to Central States' funds.

### B. *Interest Payments Jones Paid to Central States*

Jones also alleges that the interest payments on the delinquent amounts that it paid to Central States during the ninety days before the bankruptcy petition was filed constitute preferential transfers and should be avoided under 11 U.S.C. § 547(b) (1994). Central States does not argue in its briefs that the interest payments were not preferential transfers.

In *Iowa Premium,* the United States Court of Appeals for the Eighth Circuit, in determining whether certain interest payments were made on account of an antecedent debt, stated that it "will treat interest obligations like any other debt and hold that a debt for interest payments is incurred on the date upon which the obligor first becomes legally bound to pay that interest. . . . on the date on which the interest accrued." *Iowa Premium Serv. Co. v. First Nat'l Bank (In re Iowa Premium Serv. Co.),* 695 F.2d 1109, 1112 (8th Cir.1982).

The applicable provisions of the promissory notes providing for the accrual of interest are as follows:

> FOR VALUE RECEIVED, [Jones], ... promises to pay [Central States] ... interest after maturity (or the applicable payment date (whether by passage of time, acceleration, declaration or otherwise) on unpaid Principal at the Default Rate specified in Section 2 hereof (in each case computed daily on the basis of a 360–day year for each day all or any part of the Principal remains outstanding), Principal and interest hereon being payable as hereinafter provided.

Pl.'s Exs. 23 and 24.

■ The evidence establishes that the interest payments were also made for or on account of an antecedent debt. *Iowa Premium,* 695 F.2d at 1112. Central States did not dispute any of the other required elements. Therefore, for the reasons previously stated, Jones has met its burden of proving that all the elements of a preferential transfer are present as to the payments of interest.

### C. *Lien Granted to Central States*

Jones alleges that the liens granted to Central States during the preferential transfer period constitute preferential transfers and should be avoided under 11 U.S.C. § 547(b) (1994). Central States does not vigorously assert that the lien it received pursuant to the May 7, 1991, agreement was not a preferential transfer.

■ The granting of a lien as a security interest is a transfer of property within the meaning of section 547. 5 *Collier on Bankruptcy* ¶ 547.03 (Lawrence P. King et al., eds., 15th ed. 1995). The participation agreement executed within the ninety-day preference period provides that:

> Subject to the terms and conditions hereof, Lenders, in accordance with their respective Pro Rata Share, hereby assign, transfer, convey and set over to the Funds all of their right, title and interest in and to (i) $2,885,765.48 of principal amount of the Loan, including allocable interest thereon and related penalties, if any, from Borrow-

er as provided in the Loan Documents, including the right thereunder to be paid, ask, demand, sue for, take or receive such payments from Borrower (the "Funds Payments"), and (ii) to the extent necessary to satisfy fully the Funds Payments, Lenders' (x) security interest in and first lien on the Collateral and all related rights under the Loan documents, (y) rights under the Guaranty and (z) security interest in and first lien on the Pledged Stock and the proceeds therefrom and all related rights under the Pledge Agreement (collectively referred to herein as the "Funds' Security") (all of the Funds' rights hereunder, including the rights to the Funds Payments and the Funds' Security, are collectively referred to herein as the "Funds' Participation Rights").

Pl.'s Ex. 26. The transfers of the security interest and lien meet all the requirements of a preferential transfer. Therefore, Jones has met its burden of proving that all of the elements of a preferential transfer are present as to the claim of lien by Central States to the extent any lien right existed over and above the senior lien.

## III

## AFFIRMATIVE DEFENSES

Central States asserts three affirmative defenses: contemporaneous exchange for new value within the meaning of 11 U.S.C. § 547(c)(1) (1994), ordinary course of business within the meaning of 11 U.S.C. § 547(c)(2) (1994), and new value to or for the benefit of Jones within the meaning of 11 U.S.C. § 547(c)(4) (1994). Central States has the burden of proving the nonavoidability of the transfers. 11 U.S.C. § 547(g) (1994). Each of these affirmative defenses will be discussed separately below.

A. *Contemporaneous Exchange for New Value*

■ Central States asserts that the payments Jones made to Central States' funds were contemporaneous exchanges for new value and therefore cannot be avoided as preferential transfers pursuant to 11 U.S.C. § 547(c)(1) (1994).

Section 547(c)(1) provides as follows:

The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1)(A)–(B) (1994). This defense is "grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors." *Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Oil Supply & Terminaling, Inc.)*, 837 F.2d 224, 228 (5th Cir.1988) (quoting *A.I. Credit Corp. v. Drabkin (In re Auto–Train Corp.)*, 49 B.R. 605, 612 (D.D.C.1985), *aff'd*, 800 F.2d 1153 (D.C.Cir.1986)).

■ To establish its defense under section 547(c) Central States has the burden of proving that (1) it extended new value to Jones; (2) that Central States and Jones intended the new value and the contribution payments made by Jones to be contemporaneous; and (3) that the exchange was in fact contemporaneous. 11 U.S.C. § 547(g); *Tyler v. Swiss Am. Sec., Inc. (In re Lewellyn & Co.)*, 929 F.2d 424, 427 (8th Cir.1991). Each element will be discussed separately below.

1. *New Value to Jones*

Central States asserts that the new value given to Jones was "continued coverage to Jones" and a "workforce." Section 547(a) defines "new value" as:

money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not

include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2) (1994). Section 547(c)(1) expressly provides that the new value must be given directly to the debtor. 11 U.S.C. § 547(c)(1) (1994); *Bowers–Siemon Chems. Co. v. H.L. Blachford, Ltd. (In re Bowers–Siemon Chems. Co.)*, 139 B.R. 436, 448 (Bankr.N.D.Ill.1992).

■ Central States provided health and welfare and pension benefits to eligible employees of Jones. Central States' obligation to provide these benefits was owed to Jones' employees not to Jones. Central States was obligated to pay benefits to the employees even if Jones did not pay Central States. *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir.1989). Conversely, if Central States failed to provide benefits to the eligible employees, Jones was under no obligation to provide the benefits instead. *Braunstein v. UIU Health & Welfare Fund (In re Broderick Co.)*, 177 B.R. 430, 435 (Bankr.D.Mass.1995). Hence, providing benefits to Jones' employees did not satisfy any obligation of Jones that would result in augmenting the estate by reducing an outstanding liability of Jones. *In re Broderick Co.*, 177 B.R. at 435.

■ Central States also argues that the new value it provided to Jones was a workforce. This argument must also fail. Jones hired employees and paid them directly for the ongoing services they provided to Jones. The employees' right to receive benefits from Central States was not contingent on Jones making contribution payments to Central States. *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d at 1151. Providing benefits to Jones' employees is not tantamount to Central States' providing a workforce to Jones.

■ The new value given to Jones by Central States in exchange for the weekly contribution payments was forbearance. The participation agreement described the new value as follows:

> Borrower has agreed to pay, on a current basis, weekly contributions to the Funds in such amounts (which currently approximate $425,000). . . .
>
> D. The Funds will only forbear action against Borrower for unpaid and accrued pension and health and welfare contributions and accept the Fund Notes and the above-mentioned weekly pension and health and welfare contribution payments (collectively, the "P, H, & W Debt") if the payment of the Fund Notes and P, H, & W Debt is secured by the Funds' participating and sharing . . . in Lenders' (i) security interest in and first lien on the Collateral as provided in the Loan Agreement, (ii) rights under the Guaranty and (iii) security interest in and first lien on the Pledged Stock and the proceeds therefrom under the Pledge Agreement.

Pl.'s Ex. 26.

This new value was described by Priede as follows:

> Q: Well, Jones Truck Lines did not make its payments in either December or January, and the coverage continued; is that correct?
>
> A: That was based on the fact that the company had come in and talked to us and explained their situation to us and made an arrangement for insuring that the fund would be satisfied in terms of its outstanding obligations, and give us security—They promised to give us security; they promised to make weekly payments, and they did.
>
> Q: And as a result of those negotiations, the funds decided not to discontinue coverage.
>
> A: That's correct.
>
> Q: So you forbore the right to terminate coverage?
>
> A: To suspend their health coverage.
>
> Q: Right.
>
> A: That's correct.

Record at 475–76. Any legal action by Central States to collect the past due account or to initiate actions to terminate Jones' participation in the funds would have had a catastrophic effect on Jones' operations. Wishon explained that customers were:

not going to risk having large quantities of their inventory rolling on our trucks that may not either deliver timely because of our inability to maintain our financial viability or, in fact, if we were to have a disaster and potentially tie up their inventory, it could be devastating. LTL trucklines are heavily dependent upon the retail market. Retail market material is substantially time-sensitive.

Record at 85. An agreement to forbear exercising legal rights is not the new value contemplated by 11 U.S.C. § 547(a). *American Bank v. Leasing Serv. Corp. (In re Air Conditioning, Inc.)*, 845 F.2d 293, 298 (11th Cir.), *cert. denied*, 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988)); *Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1158–59 (D.C.Cir.1986). Therefore, for the foregoing reasons, Central States has not met its burden of proving that Jones received new value as required under section 547(c)(1).

### 2. *Contemporaneous Exchange*

The second and third elements that Central States must prove concern whether the exchange was intended to be contemporaneous and whether it was in fact contemporaneous. In view of the finding that Central States did not meet its burden of proving the first element of the contemporaneous exchange defense, it is not necessary to decide the contemporaneous exchange issues.

### B. *Ordinary Course of Business*

Central States asserts that the payments Jones made to Central States funds cannot be avoided as preferential transfers because they were made in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2) (1994).

Section 547(c)(2) provides as follows:

The trustee may not avoid under this section a transfer

. . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2)(A)–(C) (1994).

The legislative history indicates that the purpose of section 547(c)(2) is to "leave undisturbed normal financial relations, because [the section] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.)*, 9 F.3d 680, 683 n. 4, 685 (8th Cir.1993) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6329); *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir.1986). The exception of section 547(c)(2) must be considered in the context of the principal goal of the preference section "to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section—that of equality of distribution." *Union Bank v. Wolas*, 502 U.S. 151, 161, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1978), *reprinted in* 1978 U.S.C.C.A.N. 6137–78).

A creditor asserting the ordinary course of business defense under section 547(c)(2) must establish three elements. These elements are that the transfers were (1) made on account of a debt incurred in the ordinary course of business of the debtor and the transferee, (2) made in the ordinary course of business of the debtor and transferee, and (3) made according to ordinary business terms. 11 U.S.C. § 547(c)(2)(A)–(C) (1994); *In re U.S.A. Inns*, 9 F.3d at 682; *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1031 (7th Cir.1993). The United States Court of Appeals for the Eighth Circuit has stated that " 'there is no precise legal test which can be applied' in determining whether payments by the debtor during the 90–day period were 'made in the ordinary course of business; rather, th[e] court must engage in a "peculiarly factual" analysis.' " *In re*

*U.S.A. Inns,* 9 F.3d at 682–83 (quoting *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 497 (8th Cir.1991)).

Jones does not dispute that the requirement of subsection 547(c)(2)(A) was met; the transfers were made to satisfy debts that Jones had incurred in the ordinary course of its business dealings with Central States. The remaining two elements, however, are disputed and will be analyzed separately below.

1. *Were the Transfers Made in the Ordinary Course of Business of Jones and Central States?*

■ The second element Central States must prove is that the transfers were made in the ordinary course of business of the debtor and the transferee. 11 U.S.C. § 547(c)(2)(B) (1994). In determining whether this element has been met "the analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90–day period reflected 'some consistency' with that practice." *Lovett v. St. Johnsbury,* 931 F.2d at 498. "Even if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of Section 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties." *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.),* 888 F.2d 42, 44 (6th Cir.1989) (quoting *Waldschmidt v. Ranier (In re Fulghum Construction Corp.),* 872 F.2d 739, 743 (6th Cir.1989)).

Some factors that have been relied on by the courts in determining that transfers were not made in the ordinary course of business of the debtor and transferee include: timing of the payments (*In re Yurika Foods Corp.,* 888 F.2d at 45); changing the method of payment (*In re Craig Oil Co.,* 785 F.2d at 1566–67); making payments in response to creditor pressure (*In re Craig Oil Co.,* 785 F.2d at 1568); and making payments pursuant to a new agreement between the parties (*Tolz v. Signal Capital Corp. (In re Mastercraft Graphics),* 157 B.R. 914, 919 (Bankr. S.D.Fla.1993), *aff'd,* No. 94–6125, slip op. (S.D.Fla. Feb. 21, 1995)).

■ All the above factors are present in this case. After Jones became delinquent in its contribution payments, Central States wrote a letter to Jones stating that

unless full payment is received by the Funds or you contact me to make arrangements to the Funds' satisfaction by Wednesday, January 30, 1991, we will have no choice but to file a lawsuit in Federal District Court. Should this action be necessary, please be advised that in addition to the above amounts we will seek additional amounts owed the Funds, including but not limited to, the greater of 20% of the delinquent amount owed or a doubling of interest as well as attorneys fees and related costs.

Def.'s Ex. 20.

Central States required Jones to execute two promissory notes in the amount of the December 1990 and January 1991 delinquency and required Jones to grant a security interest to Central States. When Jones appeared recalcitrant in executing all the appropriate legal documents, Central States sent a letter that stated, "we must demand that these documents be fully executed immediately and returned to us no later than Monday, April 29, 1991 or collection action will follow." Pl.'s Ex. 25.

Central States required Jones to change the amount, timing, and method of the contribution payments. The contribution payments made during the preference period were paid weekly instead of monthly, based on estimated liability instead of actual liability, and made in one lump sum payment to a different account instead of two separate payments. The preference payments were made under intense creditor pressure and were clearly made outside the ordinary course of business of Jones and Central States.

2. *Were the Transfers Made According to Ordinary Business Terms?*

■ The third element Central States must prove is that the transfers were made according to ordinary business terms. 11 U.S.C. § 547(c)(2)(C) (1994). What constitutes ordinary business terms "will vary

widely from industry to industry." *In re U.S.A. Inns*, 9 F.3d at 685. The Eighth Circuit described the proof necessary to meet the third element as follows:

[s]ubsection (c)(2)(C) does not require a creditor to establish the existence of some uniform set of business terms within the industry in order to satisfy its burden. It requires evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems. . . . [w]e feel the focus of subsection (c)(2)(C) should be on whether the terms between the parties were particularly unusual in the relevant industry.

*In re U.S.A. Inns*, 9 F.3d at 685.

Priede testified for Central States regarding ordinary business terms. He explained that Central States had taken similar action with other delinquent employers by "getting the employer on a weekly payment arrangement for their current contributions. . . . [or] putting companies on a more frequent payment of their accruing contribution so that . . . we don't have to wait an entire month to get in a payment which would be in the multi-million-dollar amount." Record at 373–74. On cross-examination, Priede testified as follows:

Q: What standard does Central States apply to requiring employers to make weekly payments? And that is to say, requiring weekly payments, is there some financial standard that you apply? Will you accept them from anyone, or are you just restricted to some insolvency on the part of the employer before you will accept weekly payments?

A: No. I think that really depends on the specifics of each individual case, depending on what we might feel the financial condition of a company is, perhaps the size of their indebtedness, their past-due indebtedness, perhaps the size of their weekly accruing indebtedness. There's really no set standard; it's more of a judgment call.

Q: And that judgment call is made with each individual employer, isn't it?

A: Yeah, I'd have to say that; yeah.

Q: And you taylor [sic] workouts to the condition of the employer and the needs of the fund; is that correct?

A: I would say that's correct.

Q: So each workout is unique; has similarities, but each workout is really unique?

A: Like you say, there's similarities, but there are probably things that are unique about most of them.

Record at 429–30.

Priede also discussed attending seminars dealing with the collection of contributions by multi-employer funds such as Central States. Priede recalled a seminar discussion dealing with delinquencies as follows:

the recommendation that was given that contributions be started to be remitted on a weekly basis or monthly basis was stated in involving a discussion of trying to get the fund in a position of not exposing itself to further delinquencies, further accrual of additional delinquencies. And it happens to coincide with a practice that the fund has been undertaking itself for some time.

Record at 366. Priede further testified that:

there was a discussion of prohibited transactions under ERISA, specifically those being—or one of those being the prohibition against a fund from extending credit or making loans to parties in interest, a contributing employer being a party in interest; and the discussion in the materials that were provided in the course went on to provide information on an exemption from the prohibited transaction which is under ERISA . . . and there's a portion of that exemption which seemed to be relevant to this case.

Record at 366–67.

The evidence is convincing, however, that Central States went beyond ordinary industry practices in dealing with Jones. Central States not only required Jones to make the weekly payments, it required Jones to make the weekly payments as part of a coercive agreement secured by liens on all Jones' assets. The participation agreement described Jones' obligation as follows:

Borrower has agreed to pay, on a current basis, weekly contributions to the Funds in

such amounts (which currently approximate $425,000) so that as of the 15th day of each month Borrower will have fully paid to the Funds Borrower's contributions under the above-mentioned collective bargaining agreements for the preceding month. Borrower also has agreed that the Fund Notes and above-mentioned contribution obligations will be secured by a security interest in the "blanket" lien on substantially all of Borrower's assets....

D. The Funds will only forbear action against Borrower for unpaid and accrued pension and health and welfare contributions and accept the Fund Notes and the above-mentioned weekly pension and health and welfare contribution payments (collectively, the "P, H, & W Debt") if the payment of the Fund Notes and P, H, & W Debt is secured by the Funds' participating and sharing ... in Lenders' (i) security interest in and first lien on the Collateral as provided in the Loan Agreement, (ii) rights under the Guaranty and (iii) security interest in and first lien on the Pledged Stock and the proceeds therefrom under the Pledge Agreement.

Pl.'s Ex. 26.

The deposition of Nyhan, Central States' general counsel, was introduced by Jones. The deposition included the following colloquy concerning ordinary business terms in the industry:

Q: Could you describe the part of the agreement that dealt with the deferral of the past due amounts?

A: Yes. The delinquency was calculated I believe as of February 15th, which would include all obligations accrued, delinquent obligations that had been accrued but not paid during the months of December and January. That was reflected in a note, and there was a participation agreement whereby we participated in the security being held by the senior lenders on a subordinated basis and that the security was supposed to cover, among other things, the outstanding obligations reflected in those notes.

Q: You just stated that the security was to cover, among other things, the outstanding note obligations. What are the other things?

A: Well, as we all well know, those agreements were intended also to cover current obligations as they accrued.

Q: The structure of this with the subordinated participation in the loan is creative. Whose idea was that to do it that way?

A: Mine.

Q: Has Central States ever done anything like this in the past?

A: In other words, participate with a lender?

Q: Yes.

A: I don't recall. It's not common, let me tell you that[.]

. . . .

Q: Do you have knowledge regarding the standard billing cycle by which Central States bills employers?

A: Yes.

Q: And what would that be?

A: That would be they would bill them on a monthly basis for employers who are current in their contribution obligation to the fund.

Q: Is this a standard for noncurrent employers or does it vary from case to case?

A: It varies from case to case.

Pl.'s Ex. 49 at 16–18, 28–29.

The record does not reflect evidence of a prevailing practice among similarly situated members of the industry to require weekly payments, secured by all the employer's assets, under a specific threat to initiate legal action upon failure to make the weekly payments. Nor does the record reflect a prevailing practice between Central States and other delinquent employers that involved the many coercive actions taken by Central States against Jones. To the contrary, the evidence is convincing that Central States' dealings with Jones were unique, idiosyncratic, and extraordinary and not according to ordinary business terms. *In re U.S.A. Inns,* 9 F.3d at 685–86. Therefore, Central States has failed to meet its burden of proving the

elements necessary to prevail on the ordinary course of business defense.

## C.  *Subsequent New Value*

Central States asserts that the payments Jones made to Central States funds cannot be avoided as preferential transfers because of the subsequent new value defense provided by 11 U.S.C. § 547(c)(4) (1994).

Section 547(c)(4) provides as follows:

(c) The trustee may not avoid under this section a transfer—

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest;  and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4)(A)–(B) (1994).

■■■  The subsequent new value defense is "designed to accord fair treatment to creditors which replenish the debtor's operation, after receiving a preferential transfer." *Iannacone v. Klement Sausage Co. (In re Hancock–Nelson Mercantile Co.,* 122 B.R. 1006, 1016 (Bankr.D.Minn.1991). The United States Court of Appeals for the Eighth Circuit has recognized that the purpose of the subsequent new value defense is "to encourage creditors to deal with troubled businesses in the hope of rehabilitation." *Kroh Bros. Dev. Co. v. Continental Construction Eng'rs, Inc. (In re Kroh Bros. Dev. Co.),* 930 F.2d 648, 651 (8th Cir.1991).

■■■  As discussed previously, Central States did not provide new value to Jones directly or for the benefit of Jones in the form of "continued coverage" or a "workforce." Even if it had been determined that Central States had provided the new value as it alleged, thereafter Central States received payment for most of the purported new value when Jones made its weekly estimated payments. The Eighth Circuit noted that the subsequent new value defense under section 547(c)(4) requires that:

the preferred creditor must advance "new value" to the debtor on an unsecured basis. . . . [and] the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition.

*In re Kroh Bros. Dev. Co.,* 930 F.2d at 652 (quoting *New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.),* 880 F.2d 679, 680 (3d Cir.1989)). The Eighth Circuit explained this requirement stating that "the relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate. If the new value advanced has been paid for by the debtor, the estate is not replenished and the preference unfairly benefits a creditor." *In re Kroh Bros. Dev. Co.,* 930 F.2d at 652.

Central States argues that the Eighth Circuit's holding in *Kroh Bros.* is dicta and cites the Fifth Circuit's criticism of the case in *Laker v. Vallette (In re Toyota of Jefferson),* 14 F.3d 1088, 1093 n. 2 (5th Cir.1994). However, the holding in *Kroh Bros.* is not dicta, but is a binding precedent that must be followed. It is not necessary, however, to compute what amount of new value, if any, remained unpaid on the date the petition was filed because Central States did not meet its burden of proving that it gave new value to or on behalf of Jones as required by section 547(c)(4).

Therefore, for the reasons stated, Central States has failed to meet its burden of proving the elements necessary to prevail on the subsequent new value defense.

## IV

## CONCLUSION

For the reasons stated herein, Jones is entitled to a judgment against Central States for the sum of $5,743,491.61. Jones is also entitled to a judgment avoiding the security interest in Jones' assets granted during the ninety days preceding the filing of the bankruptcy petition. A separate judgment will be entered pursuant to Fed.R.Bankr.P. 9021.

IT IS SO ORDERED.