214 B.R. 891 (1997)
In re SPIRIT HOLDING CO., INC., Debtor.
CENTRAL HARDWARE CO., INC., Plaintiff,
v.
THE WALKER-WILLIAMS LUMBER CO., Defendant.
No. 4:97CV148SNL.
United States District Court, E.D. Missouri, Eastern Division.
November 14, 1997.
*892 *893 David A. Sosne, Summers and Compton, St. Louis, MO, Jonathan D. Taft, Sonnenschein and Nath, Chicago, IL, for Central Hardware Company, Inc.
Stuart J. Radloff, Radloff and Riske, St. Louis, MO, Laurel Hartschorn, Saxonburg, PA, for Walker-Williams Lumber Company.
Peter Lumaghi, U.S. Dept. of Justice, Office of Trustee, Carol Ann Robinson, Clerk, U.S. Bankruptcy Court, St. Louis, MO, for Trustee.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
This matter is before the Court on the appeal of plaintiff Central Hardware Co. from the final order of the United States Bankruptcy Court for the Eastern District of Missouri denying Central's motion for summary judgment, granting defendant Walker-Williams Lumber Co.'s cross-motion for summary judgment, and dismissing Central's complaint seeking avoidance under 11 U.S.C. § 547(b) of a wire transfer replacing an uncashed check issued to defendant Walker-Williams three (3) days prior to the wire transfer. This Court has appellate jurisdiction of this matter pursuant to 28 U.S.C. § 158(a). After careful consideration, for the *894 reasons set forth below, the Court reverses the decision of the Bankruptcy Court and remands the case to the Bankruptcy Court for the Eastern District of Missouri for further proceedings.

Procedural Background
Plaintiff Central brought this adversary proceeding under 11 U.S.C. § 547(b) to avoid as a preferential transfer a $129,612.22 wire transfer made to Walker-Williams four (4) days prior to the commencement of Central's bankruptcy case. The wire transfer was initiated by Central to replace a check dated and presented to Walker-Williams three (3) days earlier. Both Central and Walker-Williams filed for summary judgment. Central contended that the wire transfer was an avoidable preferential transfer made within ninety (90) days of the filing of bankruptcy; i.e. made within the statutory prepetition period. 11 U.S.C. § 547(b). Walker-Williams contended that the wire transfer was a payment in the ordinary course of business and, therefore, not avoidable under 11 U.S.C. § 547(c)(2).
On April 24, 1996 a hearing was held by the Bankruptcy Judge on the parties' cross-motions.[1] After consideration of the parties' pleadings, and submitted affidavits, the Bankruptcy Court denied Central's motion for summary judgment, granted Walker-Williams' cross-motion for summary judgment, and dismissed Central's complaint to avoid and recover the $129,612.22 wire transfer finding that the transfer in question was made in the ordinary course of business with the provisions of § 547(c)(2).[2]

Issues on Appeal
1) Whether a wire transfer made by a debtor to a creditor, to replace a previously tendered check upon which the debtor has stopped payment, shortly before the debtor's bankruptcy filing is a transfer made in the ordinary course of business and thus, not avoidable pursuant to 11 U.S.C. § 547(c)(2)?
2) Whether, based upon the record presented, the Bankruptcy Court properly granted summary judgment in favor of defendant Walker-Williams?

Applicable Standard of Review
On an appeal, the United States District Court may affirm, modify, or reverse a judgment, order, or decree of a bankruptcy judge, or remand to the bankruptcy court with instructions for further proceedings. This Court must affirm the decision of a bankruptcy court if it is supported by law and the facts contained in the record. In reviewing a bankruptcy court's ruling, the bankruptcy court's legal conclusions are reviewed de novo, while its findings of fact are reviewed under a "clearly erroneous" standard. In re Apex Oil, 884 F.2d 343, 348 (8th Cir.1989); Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir.1987); Pronto Enterprises v. United States, 188 B.R. 590, 591-92 (W.D.Mo.1995); Spackler v. Boatmen's National Bank, 165 B.R. 267 (E.D.Mo.1993). Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of a bankruptcy court to judge the credibility of the witnesses. In re Apex Oil, at 348; In re Van Horne, 823 F.2d 1285, 1287 (8th Cir.1987); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985). Under Bankruptcy Rule 8013, findings of fact are clearly erroneous when they are not supported by substantial evidence, contrary to the clear preponderance of the evidence, or based on an erroneous view of the law. In re Cook, 72 B.R. 976 (W.D.Mo. 1987). It is incumbent upon the reviewing court to review the entire evidentiary record because "[a] finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 500 (8th Cir.1991) quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 *895 S.Ct. 525, 541-42, 92 L.Ed. 746 (1948); see also, In re Apex Oil, at 348.
A bankruptcy court's interpretation of § 547(c)(2) in order to determine whether a payment is made in the ordinary course of business, and is not a recoverable preference transfer, is a factual analysis that may not be set aside unless clearly erroneous. In re U.S.A. Inns of Eureka Springs, Arkansas, 9 F.3d 680, 685 (8th Cir.1993); In re Yurika Foods Corp., 888 F.2d 42, 45 (6th Cir.1989). Consequently, this Court may not set aside the Bankruptcy Court's decision in this matter unless it is clearly erroneous.
The following is a recitation of the Bankruptcy Court's findings of fact[3]:
1) For a period of over a year before the Debtor's bankruptcy filing, Walker-Williams sold lumber products on credit to Central. Walker-Williams continued to supply product to the Debtor on almost a daily basis up to Central's bankruptcy filing.
2) Shortly before the bankruptcy filing, Central sent Walker-Williams a check dated March 22, 1993 in the amount of $129,612.22 (the "Check"). This Check was in payment of certain outstanding invoices that Walker-Williams had issued to the Debtor for lumber products shipped to the Debtor by Walker-Williams.
3) On March 24, 1993, there were telephone conversations between representatives of the Debtor and Walker-Williams regarding the Debtor's issuance of the Check and Walker-Williams receipt thereof. The only details of these conversations have been provided by John Hite, the President and CEO of Walker-Williams. Mr. Hite's uncontroverted testimony is that the telephone calls were initiated for the purpose of determining Central's intentions in light of the filing of bankruptcy by spirit.[4] During the conversation, the representative of Central advised Walker-Williams that the Debtor was going to issue a wire transfer to replace, supercede, or supplant the Check.
4) On March 25, 1993, the Debtor stopped payment on the Check and issued a wire transfer to Walker-Williams in the amount of $129,612.22 (the "Wire Transfer"). The confirmation form for the wire transfer contains the note "stop payment ck #551003", suggesting that the transfer and stop payment occurred contemporaneously.
5) There is no evidence that the Wire Transfer was solicited by Walker-Williams or that Walker-Williams threatened to terminate shipments of product or take any other collection action if it did not receive payment of the $129,612.22. Rather, it is the uncontroverted testimony of Mr. Hite and Mr. Gindville[5] that the wire transfer was made solely on the Debtor's initiative. During the time period in question, Walker-Williams was continuing to supply product on credit to the Debtor on almost a daily basis in accordance with the parties' normal course of dealing.
6) It is undisputed that the amount of the Check and Wire Transfer was not unusual compared to other payments made to Walker-Williams by the Debtor during the several years preceding the bankruptcy filing.
7) It is undisputed that the timing of the Wire Transfer was consistent with the parties' payment practices.
The Bankruptcy Court found that Walker-Williams had established the three (3) elements necessary to successfully invoke the ordinary course of business defense to a preferential transfer lawsuit. The Bankruptcy Court found that 1) the debt paid by the alleged preferential payment was incurred in the ordinary course of business between Central and Walker-Williams; 2) that the challenged payment was made in the ordinary course of business between Central and *896 Walker-Williams; and 3) the challenged payment was made according to ordinary business terms.
In reaching this decision, the Bankruptcy Court held that a simple change in method of payment did not, in and of itself, take a transaction outside the ordinary course of business. It noted that "[w]hile the Court recognizes that the Debtor normally paid Walker-Williams by check, it also recognizes that the Debtor paid other creditors on several occasions by wire transfer in the one-year period prior to filing of the bankruptcy. Based on these facts, the court is satisfied that a wire transfer is sufficiently consistent with other business transactions between the parties and within the industry so as not to be outside the ordinary course of the parties' businesses." Bankruptcy Court's Memorandum Opinion, pgs. 7-8. It further found that the replacement aspect of the Wire Transfer did not take the transaction outside of the ordinary course of business because, unlike certain caselaw cited by the Central, the subject check had not been dishonored prior to replacement. The Court opined that the present case differed from other cases because "[i]t was as if the Check had never been issued." Bankruptcy Court's Memorandum Opinion, pg. 8. The Bankruptcy Court also rested its conclusions significantly on its belief that no undue pressure by Walker-Williams had induced the replacement of the check by the wire transfer.
Finally, the Bankruptcy Court found that the challenged payment was made according to ordinary business terms because the evidence showed that wire transfers, although not the common method of payment in the industry, are occasionally used as a method of payment in the industry. The Court stated that "[t]here was nothing unusual with regard to the size, timing, nature or form of the Wire Transfer to set it apart from other payments that are routinely made by retailers to suppliers in the industry." Bankruptcy Court's Memorandum Opinion, pg. 9.
Central does not appeal the issue of whether the transfer was a payment of a debt incurred in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2)(A). Only the second two elements of § 547(c)(2) are at issue in this appeal: S § 547(c)(2)(B) and (C).[6] Furthermore, in the proceedings before the Bankruptcy Court, Central conceded $53,415.00 in new value was delivered after March 25, 1993 and was not subject to Walker-Williams' reclamation claim. Thus, Central seeks the recovery of only a net preference of $76,197.22.
Section 547(b) provides that transfers made by the debtor ninety (90) days prior to the filing of a bankruptcy petition may be avoided by the trustee in bankruptcy as a "preference". However, a creditor who successfully asserts the "ordinary course of business" defense provided by § 547(c)(2) thwarts the trustee's avoidance powers and retains the challenged payment.
Section 547(c)(2) provides in pertinent part:
The trustee may not avoid under this section a transfer ...
(2) to the extent that such transfer was 
(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms.
Section 547(c)(2) is intended to protect recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee. In re Keller Tool Corp. (Riske v. C.T.S. Systems), 151 B.R. 912, 914 (Bankr. E.D.Mo.1993).
"The legislative history indicates that the purpose of section 547(c)(2) is to `leave undisturbed normal financial relations, because [the section] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.' The exception of *897 section 547(c)(2) must be considered in the context of the principal goal of the preference section `to deter the race of diligence of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section  that of equality of distribution.'"
In re Jones Truck Lines, Inc., 196 B.R. 483, 493 (Bankr.W.D.Ark.1995) (citations omitted); In re Keller Tool Corp., at 914; see, Union Bank v. Wolas, 502 U.S. 151, 161, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991); In re Gateway Pacific Corp., 205 B.R. 164, 167 (Bankr.E.D.Mo.1997).
In order to successfully establish an ordinary course of business defense, the transferee must prove by a preponderance of the evidence all three elements of § 547(c)(2). In re U.S.A. Inns of Eureka Springs, Arkansas, at 682. Furthermore, each element is distinct and must be proven independently of the other two. In the Matter of Midway Airlines, 69 F.3d 792, 798 (7th Cir.1995) citing In re U.S.A. Inns of Eureka Springs, Arkansas, at 684.

Section 547(c)(2)(B)
Under § 547(c)(2)(B), the transferee must show that the debtor made the transfer in the ordinary course of business or financial affairs of the debtor and the transferee. The United States Court of Appeals for the Eighth Circuit has stated that "`there is no precise legal test which can be applied' in determining whether payments by the debtor during the 90-day period were `made in the ordinary course of business'; `rather th[e] court must engage in a "peculiarly factual" analysis.'" In re U.S.A. Inns of Eureka Springs, Arkansas, at 682-83 quoting Lovett v. St. Johnsbury Trucking, at 497; see also, In re Gateway Pacific Corp., at 167; In re Jones Truck Lines, at 493-94.
The focus of § 547(c)(2)(B) is the past relationship between the debtor and the transferee creditor. "[T]he cornerstone of this element of a preference defense is that the creditor needs to demonstrate some consistency with other business transactions between the debtor and the creditor." Lovett v. St. Johnsbury Trucking, at 497 quoting In re Magic Circle Energy Corp., 64 B.R. 269, 272 (Bankr.W.D.Okla.1986); see also, Jones Truck Lines, 83 F.3d 253, 257 (8th Cir.1996) (approving trial court's instructions on § 547(c)(2)(B) as meeting requirements of Lovett, supra that court focus on past practices of debtor and transferee only). "Even if the debtor's business transactions were irregular, they may be considered `ordinary' for purposes of Section 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties." In Re Jones Truck Lines, 196 B.R. at 494 quoting Yurika Foods Corp., at 44.
Among the factors courts consider in determining whether transfers are ordinary in relation to past practices between the debtor and the transferee creditor are: 1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or the creditor engaged in any unusual collection or payment activity; and 4) whether the creditor took advantage of the debtor's deteriorating financial condition. In Re Grand Chevrolet, Inc., 25 F.3d 728, 732 (9th Cir.1994) citing In re Richardson, 94 B.R. 56, 60 (Bankr.E.D.Pa.1988).
In the present case, the analysis regarding § 547(c)(2)(B) focuses primarily on the form of tender; i.e. whether the transfer in question was made in a similar manner to transfers made prior to the preference period. The Bankruptcy Court, after determining that there had been no undue pressure exerted by Walker-Williams which precipitated the wire transfer, held that a change in the method of payment was insufficient grounds to render the payment outside the ordinary course exception. After reviewing the entire factual record, this Court finds that the Bankruptcy Court's findings were clearly erroneous.
It was undisputed that Central and Walker-Williams had engaged in similar transactions for a number of years. The uncontroverted evidence was that out of 238 separate transfers from Central to Walker-Williams between January 1, 1991 and March 29, 1993 only one transfer had been changed from a check to a wire transfer  the switch being *898 made four (4) days before filing for bankruptcy. All prior transfers had been made by check and no other checks had been replaced by a wire transfer.
The Bankruptcy Court focused on two factors: firstly, that there was no credible evidence that Walker-Williams engaged in any unusual collection activity during the preference period; and secondly, that the change in method of payment was not outside the ordinary course of business because Central had paid other creditors on several occasions by wire transfer in the one-year period prior to filing for bankruptcy.
Payments made in response to unusual debt collection practices by the creditor are outside of the scope of the ordinary course of business defense. In re Craig Oil, 785 F.2d 1563, 1566 (11th Cir.1986); In re Schwinn Bicycle, 205 B.R. 557, 572 (Bankr.N.D.Ill. 1997); Jones Truck Lines, 196 B.R. at 494; In the Matter of Brown Transport Truckload, 161 B.R. 735, 739-40 (Bankr.N.D.Ga. 1993). The Court agrees that there was no credible evidence to indicate that the replacement of the check with a wire transfer was in response to any undue or intense pressure from Walker-Williams to do so. Mr. Hite's uncontroverted testimony was that he initiated contact with Central (upon learning of the bankruptcy filing by Central's parent corporation, Spirit Holding) to simply find out what Central's "intentions" were, and that the Central representative advised Mr. Hite that Central was going to replace the check with the wire transfer. Furthermore, the Court agrees that Mr. Eager's affidavit[7] fails to set forth facts as to the circumstances of the telephone conversation and/or the reasons behind the replacement of the check with a wire transfer. He merely speculates that the a check would be replaced by a wire transfer if a vendor refused to ship product unless such a change in payment method took place. Such a speculation fails in the face of the fact that Walker-Williams continued to ship product on credit on an almost daily basis.
However, the Bankruptcy Court erred in refusing to consider whether the wire transfer was in response to unusual "payment practice(s)". In describing the ordinary course of business exception, Congress stated that:
"[i]ts purpose is to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or the creditor during the debtor's slide into bankruptcy."
H.R.Rep. No. 595, 95th Cong., 1st Sess. 373-74 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 6329 (emphasis added); see also Union Bank v. Wolas, 502 U.S. at 160, 112 S.Ct. at 532-33. It is clear that Congress' intentions in formulating § 547(c)(2) was to protect those payments which do not result from "unusual" debt collection or payment practices. See, In re Craig Oil, at 1566; In the Matter of Brown Transport Truckload, at 739-40. Consequently, it is necessary to look at not only the creditor's actions during the preference period, but also the debtor's actions. In the present case, the uncontroverted evidence is that the replacement of the check by wire transfer was the result of Central's initiative (a fact recognized by the Bankruptcy Court). Central had never paid Walker-Williams by wire transfer before, let alone, replaced a check with a wire transfer. There was simply no evidence that a payment by wire transfer was ever part of the practice between Central and Walker-Williams. All the evidence was that, except for the challenged payment, payments, were made by company check. Clearly, Central's replacement of the check with a wire transfer was not consistent with the established past practices between the parties. See, In re Valley Steel Corp., 182 B.R. 728, 737 (Bankr.W.D.Va.1995). Accordingly, this Court finds that the replacement of the check by a wire transfer was not made in the ordinary course of business.
The Bankruptcy Court was particularly impressed with the holdings of the bankruptcy *899 courts in In re Matter of Brown Transport Truckload, supra and Sims Office Supply, Inc. v. Ka-D-Ka, Inc., 94 B.R. 744 (Bankr.M.D.Fla.1988). Both these courts opined that a change in the method of payment is not sufficient grounds, in and of itself, to remove a transfer from the ordinary course of business exception. See, Brown Transport Truckload, at 740 ("Simple changes in the amount of credit that a creditor is willing to extend to a debtor, and changes in method of payment by a debtor to a creditor are not enough to make the business relationship not ordinary. More drastic changes must be effected before payments are considered not to be ordinary."); Sims Office Supply, at 749-50. In Sims, the challenged replacement payment was made more than a month prior to the filing of bankruptcy by the debtor. In Brown Transport Truckload, the debtor changed its method of payment prior to the commencement of the preference period, and continued to pay by the new method throughout the preference period. These cases are not an "eve of bankruptcy" case as is the instant one. Those cases are limited to their narrow facts and are inapposite to the facts presented in this case.
The Bankruptcy Court further erred in focusing on the payment practices as between Central and other creditors in its application of § 547(c)(2)(B). Section 547(c)(2)(B) focuses on the past practices of the parties only. The "ordinary course of business" is established by the past practices of the debtor and the transferee creditor, not the past practices of either the debtor or the transferee with other parties. Jones Truck Lines, 83 F.3d. at 257 (In approving the lower court's instructions as to § 547(c)(2)(B), the Eighth Circuit Court of Appeals held that the focus on the relationship between the debtor and creditor was proper and that "[the creditor's] contention that the court should have focused the jury's attention on [the debtor's) late payments to other creditors and on (the creditor's] acceptance of late payments from other debtors is wrong."); In re U.S.A. Inns of Eureka Springs, Arkansas, at 682; Lovett, at 497. The Bankruptcy Court clearly erred when it focused on Central's payment by wire transfer to other creditors as proving that no change in method of payment occurred as between Central and Walker-Williams which took the challenged payment outside the ordinary course of business between these two parties.

Section 547(c)(2)(C)
Even if this Court were to find that the Bankruptcy Court had not erred in its factual findings and legal conclusions when it held that defendant Walker-Williams had established the second element required under § 547(c)(2), this Court finds that the defendant failed to meet its burden in establishing the third required element; i.e. § 547(c)(2)(C), that the payment was made according to "ordinary business terms". The Bankruptcy Court's finding that Walker-Williams had proven that the challenged payment was made according to ordinary business terms was clearly erroneous.
Under subsection § 547(c)(2)(C), the transferee must show that the challenged payment was made according to ordinary business terms. In re U.S.A. Inns of Eureka Springs, Arkansas, at 683. The "ordinary business terms" test is an objective test which focuses upon the practices of the creditor's competitors. The Eighth Circuit Court of Appeals, in concurring with the Seventh Circuit's review and analysis of the proof necessary for a defendant creditor to carry its burden under subsection (c)(2)(C), described the proof necessary for the third element of the ordinary course of business defense as follows:
"What constitutes `ordinary business terms' will vary widely from industry to industry ... Subsection (c)(2)(C) does not require a creditor to establish the existence of some uniform set of business terms within the industry in order to satisfy its burden. It requires evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems. The legislative history reveals only that the purpose of § 547(c)(2) is `discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.' In light of the statute's construction and its *900 legislative history, we feel the focus of subsection (c)(2)(C) should be on whether the terms between the parties were particularly unusual in the relevant industry, and that evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems is sufficient to satisfy subsection (c)(2)(C)'s burden. We agree with the Seventh Circuit's formulation [citing In re Matter of Tolona Pizza Products Corp., 3 F.3d 1029, 1033 (7th Cir.1993)] that "`ordinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection (C).""
In re U.S.A. Inns of Eureka Springs, Arkansas, at 685 (legislative citation omitted); see also, In re Schwinn Bicycle Co., at 573; In re Jones Truck Lines, 196 B.R. at 495.
In the present case, the Bankruptcy Court found that defendant Walker-Williams had carried its burden under § 547(c)(2)(C) because "[t]here was nothing unusual with regard to the size, timing, nature, or form of the Wire Transfer to set it apart from other payments that are routinely made by retailers to suppliers in the industry." Bankruptcy Court's Memorandum Opinion, pg. 9. This finding rested entirely on the affidavit of Mr. Gindville from which the Bankruptcy Court gleaned "... although payments are typically made by check, many retailers in the industry will, on occasion, make payments by wire transfer." Bankruptcy Court's Memorandum Opinion, pg. 9. This led the Bankruptcy Court to opine that "it is apparent that the Wire Transfer can in no sense be considered to be `so idiosyncratic as to fall outside that broad range' of conduct and practice followed by parties similarly situated to Walker-Williams and Central." Bankruptcy Court's Memorandum Opinion, pg. 9.
In his affidavit, Mr. Gindville attests that he has held (at the time of the affidavit  November 1995) the position of Secretary, Treasurer and Chief Financial Officer of Walker-Williams for five (5) years. He further attests that he has worked in the wholesale lumber distribution industry for approximately five (5) years. Gindville Affidavit, paragraphs 3 and 4. He attests that part of his responsibilities is "to know generally the payment terms that the competitors of Walker-Williams offer their customers." He has gained this knowledge through conversation with "Walker-Williams sales personnel, with individuals in charge of credit and purchasing decisions as well as with customers and competitors of Walker-Williams." Gindville Affidavit, paragraph 5. He further attests that through his membership with the Building Materials Manufacturers Credit group of the National Association of Credit Management he has "a good general knowledge of the credit and collection practices of numerous other companies engaged in the wholesale lumber distribution industry." Gindville Affidavit, paragraph 7.
Finally, as to payment method, Mr. Gindville attests as follows:
"On occasion customers of Walker-Williams deviated from their standard payment procedure. Depending upon the circumstances creating the need for the deviation, this practice was acceptable to Walker-Williams and to other companies in the wholesale lumber products distribution industry."
Gindville Affidavit, paragraph 18. With regard to the challenged payment method change, Mr. Gindville's only remarks are as follows:
"On March 24, 1993, Walker-Williams received Central's check number 551003 in the amount of $129,612.22 in payment of 19 invoices. This check was sent directly to our bank by Central as was the ordinary course of business between Central and Walker-Williams. Central's account was credited with payment based upon receipt of the check.
On March 25, 1995[8] Walker-Williams received a wire transfer in the amount of *901 $129,612.22 in payment of the check. Central stopped payment on check number 551003 at the time it sent the wire."
Gindville Affidavit, paragraphs 18, 19 and 20.
At the time of his affidavit, Mr. Gindville had been in the wholesale lumber distribution industry for only a few years, and evidently, his entire employment in the industry had been with the defendant. He speaks only of obtaining "general knowledge" of the credit and collection practices of other companies. He fails to identify even one of these other companies. In fact, nowhere in his affidavit does he identify any one of Walker-Williams' competitors of which he has personal knowledge of their credit and collection practices. He attests only that under some unidentified circumstances, other customers of Walker-Williams have been allowed to "deviate" from their customary practice and that this "deviation" was also acceptable to other unidentified companies. Finally, he attests only that payment by check was the "ordinary course of business" between Central and Walker-Williams. Nowhere does he attest that stopping payment on a check and replacing it with a wire transfer was the "ordinary course of business" between the parties. More importantly, nowhere does he attest that stopping payment on a check and replacing it with a wire transfer was the "ordinary course of business" or a common occurrence with the other unidentified companies.
This type of vague generalized evidence is not the type that courts have found sufficient to meet the burden of establishing § 547(c)(2)(C). "A creditor's evidence on the `ordinary business terms' may not be vague and must be based on personal first-hand knowledge gained from exposure to the competitors' collections practices during or near the preference period. General testimony by an employee of the defendant, unsupported by any specific data, is insufficient to prove `ordinary business terms'." In re Schwinn Bicycle Co., at 573 (citations omitted). In In re U.S.A. Inns of Eureka Springs, Arkansas, at 685, the defendant creditor's Chairman of the Board, President, and Chief Financial Officer testified to the regular practice in the savings and loan industry to work with delinquent customers as long as a payment was forthcoming. He further testified that the Office of Thrift Supervision had directed the defendant to work with delinquent customers in a manner that conformed to industry-wide standards. Id., at 685. Finally, he testified that the manner in which the debtor plaintiff had paid the defendant was in accordance with the ordinary business terms in the savings and loan industry for the type of subject real estate trouble loan. Id., at 685. The appellate court felt that this specific and firsthand knowledge testimony was "sufficient evidence that United [defendant] was following the prevailing practice among similarly situated savings and loans with delinquent customers to satisfy (c)(2)(C)'s burden." Id., at 685-86. In other cases, preference defendants have satisfied the § 547(c)(2)(C) burden by introducing evidence of its competitors' receivable and collections practices, even the actual payment practices of its competitors' customers (In re Schwinn Bicycle Co., at 573 citing In the Matter of Tolona Pizza Products Corp., at 1033; Solow v. Ogletree, Deakins, Nash, Smoak & Stewart, 180 B.R. 1009, 1016 (Bankr.N.D.Ill.1995); Luper v. Columbia Gas of Ohio, Inc., 91 F.3d 811, 814 (6th Cir.1996)); or have testified as to actual industry-related seminars or workshops they have attended which contributed to their personal knowledge of the prevailing practices among similarly situated members of the industry (In re Jones Truck Lines, 196 B.R. at 495).
It is clear that Section 547(c)(2)(C) requires objective specific evidence that the disputed payment is "ordinary" in relation to the prevailing standards in the creditor's industry. As noted before "[i]t requires evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems." In re U.S.A. Inns of Eureka Springs, Arkansas, supra. Here there was no evidence as to the prevailing practice in the industry. Mr. Gindville only spoke of a "deviation"; he never explained what constituted the deviation. He never identified the circumstances under which such a "deviation" was acceptable to other companies. He never identified the other companies or gave any evidence as to *902 their customary business practices. In short, he never presented any evidence that any other company or companies in the industry routinely, or even occasionally, had their customers replace a standard payment by check with a wire transfer. Accordingly, Walker-Williams produced no evidence sufficient to carry its burden under subsection (c)(2)(C). The Bankruptcy Court clearly erred by holding otherwise.

Standard under which the Bankruptcy Court adjudged the respective motions for summary Judgment
The Court has reviewed the entire record on appeal and finds that the Bankruptcy Court did not err in its review and analysis of the cross-motions for summary judgment. To find in favor of one party, and not the other, especially as regards cross-motions for summary judgment, does not inherently imply that the reviewing court failed to view the facts in a light most favorable to the unsuccessful party.
Accordingly,
It is this Court's determination that defendant Walker-Williams failed to produce the evidence necessary to meet its burden under § 547(c)(2). The Bankruptcy Court clearly erred in finding that the challenged payment was made in the ordinary course of business or financial affairs of the debtor. The decision of the Bankruptcy Court will be reversed and appellant Central Hardware's motion for summary judgment shall be granted, and appellee Walker-Williams' motion for summary judgment denied. Appellant Central Hardware's complaint to avoid and recover the March 22 (or 25, as the case may be), 1993 preferential transfer should be reinstated and granted. The case will be remanded for further proceedings consistent with this opinion.
NOTES
[1] A transcript of this hearing has been filed with the Court and is a part of the appellate record.
[2] The Bankruptcy Judge made his ruling from the bench, and instructed counsel for Walker-Williams to provide him with an order and memorandum opinion. The final order issued by the Bankruptcy Court, on December 20, 1996, is a version of the memorandum opinion Walker-Williams' counsel provided that the Bankruptcy Court modified to accord with the Bankruptcy Court's impressions. Bankruptcy Court Order, dated December 20, 1996, pg. 2, n. 1.
[3] These factual findings are taken directly from the Bankruptcy Court's December 20, 1996 final order.
[4] Although not technically a "finding of fact" as set forth by the Bankruptcy Court, it is important to note, as did the Bankruptcy Court, that Central's parent corporation (Spirit Holding Co.) had filed a Chapter 11 petition on March 23, 1993; and that the telephone call inquiring about Central's intentions in light of Spirit's bankruptcy filing had been initiated by Mr. Hite on behalf of Walker-Williams.
[5] At the time of the hearing, John Gindville was the Secretary, Treasurer and Chief Financial Officer of Walker-Williams.
[6] Inherent in formulating the disputed issues, is the fact that the parties do not dispute the preferential nature of the subject payment, and that the requirements of § 547(b) were satisfied.
[7] During the relevant time-period, James Eager was Central's Vice-President of Finance and responsible for authorizing wire transfers.
[8] The affidavit uses the date "March 25, 1995"; however, the evidence is quite clear that the correct date is "March 25, 1993".