**In re Murray F. ARMSTRONG.**

**William S. Meeks, Trustee, plaintiff,**

**v.**

**Harrah's Tunica Corporation d/b/a Harrah's Casino Cruises– Tunica, defendant.**

**Bankruptcy No. 96–50087 S. Adversary No. 96–5050.**

United States Bankruptcy Court, E.D. Arkansas, Pine Bluff Division.

Jan. 28, 1999.

Order Denying Reconsideration, Feb. 5, 1999.

**726**

Thomas Streetman, Crossett, AR, for plaintiff.

Richard Ramsay, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARY D. SCOTT, Bankruptcy Judge.

THIS CAUSE is before the Court upon the trial of the Complaint to Recover Money or Property. The trustee seeks to recover funds from a casino under Bankruptcy Code sections 547, 548(a)(1) and Arkansas Code § 16–118–103. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 157(b)(2)(F). Inasmuch as the Court finds the payment to be a preference to which the section 547(c) defenses are unavailable, the Court does not address the merits of the second and third counts of the complaint.

The debtor in this case, Murray Armstrong, is an attorney who organized Ponzi schemes [1] and embezzled massive amounts of funds from his clients to support his snowballing Ponzi schemes and gambling debts. His bankruptcy discharge has been denied and he is now incarcerated in a state penitentiary for his crimes. The defendant operates Harrah's Casino Cruises ("Harrah's") in Tunica, Mississippi. Harrah's is licensed and operates under the laws of the state of Mississippi and the regulations of the Mississippi Gaming Commission. *See generally* Miss. Code Ann. § 75–76–1, *et seq.*

In 1990 Armstrong began experiencing financial difficulties. In order to rectify his problems, he began operating a Ponzi scheme based upon a non-existent timber contract. As is the nature of Ponzi schemes, his financial difficulties were exacerbated rather than remedied. In an effort to support the snowballing debts arising from his scheme, he borrowed money, and in 1994, began gambling in hopes of winning enough money to fund the collapsing Ponzi schemes. Check kiting became a means of supporting his new way of life. In the final days of his financial collapse Armstrong defrauded elderly clients of their life savings. When one of his schemes was finally exposed, they all collapsed. On January 30, 1996, an involuntary bankruptcy petition was filed and an order for relief was entered on March 13, 1996.

On October 12 and 13, 1995, Armstrong gambled at Harrah's, signing 26 markers in the total sum of $50,000. Although Armstrong did not have sufficient funds in his bank account, the bank on which the markers were drawn held the markers until Armstrong was able to deposit sufficient funds with which to pay the markers. The bank honored the markers on November 14 or 15. A marker is an advance or loan commonly used by casinos which may be exchanged for

---

1. Ponzi schemes are schemes in which returns to investors are financed through funds from new investors rather than through the success of the underlying business venture. *See generally In re Hedged–Investments Assoc.*, 48 F.3d 470 (10th Cir.1995).

cash or chips in order to gamble.[2] *See United States v. Abodeely,* 801 F.2d 1020, 1022 (8th Cir.1986). Prior to permitting a patron to utilize the marker system, however, Harrah's investigates the patron's financial background, including whether the patron frequents other gaming establishments, and whether markers have been regularly and timely paid by the patron's bank. Harrah's obtains a credit report as well as information from the gambler's designated bank. Harrah's ordinarily holds markers for seven days but, in no event, for more than thirty days.

On October 12, 1995, Armstrong appeared at Harrah's for the first time, applied for and was given a $20,000 line of credit. Later that same day, the line of credit was increased to $30,000. On October 13, 1995, Armstrong was granted a line of credit in the amount of $50,000, which he exhausted by the end of the day. Thus, the casino held markers from Armstrong totaling $50,000.

Initially, on October 12, 1995, Harrah's agreed to hold Armstrong's markers for fourteen days. On October 13, 1995, however, Harrah's extended that time to thirty days, and on November 12 and 13, 1995, they were deposited. On November 14, 1995, the markers were presented at Armstrong's bank for payment. Although Armstrong did not have sufficient funds in the bank to pay the markers, the bank held the markers for a day in order to permit Armstrong to obtain funds to cover the markers. The markers were paid on November 15 and 16, 1995.

The evidence was overwhelming that the debtor was at the time of the transactions, as he had been for several years prior to the filing of this bankruptcy case, hopelessly insolvent.

## I. *Section 547(b): Preference*

Count I of the complaint alleges that the payment of the markers on November 15 and 16, 1995, dates occurring within the ninety days of the filing of the bankruptcy petition, constitutes a preferential payment the trust-

ee is entitled to recover under section 547(b). Bankruptcy Code section 547 provides in pertinent

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
>> (1) to and for the benefit of a creditor;
>>
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>>
>> (3) made while the debtor was insolvent;
>>
>> (4) made—
>>
>>> (A) on or within ninety days before the date of the filing of the petition; or
>>>
>>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>>
>> (5) that enables such creditor to receive more than such creditor would receive if—
>>
>>> (A) the case were a case under chapter 7 of this title;
>>>
>>> (B) the transfer had not been made; and
>>>
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
>
> (g) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

11 U.S.C. §§ 547(b), (g).

■ The trustee plaintiff bears the burden of proving the elements of avoidability under section 547(b) by a preponderance of the evidence. *Nordberg v. Arab Banking Corporation (In re Chase & Sanborn Corporation),* 904 F.2d 588, 595 n. 15 (11th Cir.1990).

---

2. Harrah's characterizes the use of markers as a negotiable instrument used in the gaming industry whereby a patron buys chips in return for the marker drawn on a designated bank. Harrah's analogizes the use of markers to checks used to purchase goods at any other retail outlet since the markers are payable upon execution and Harrah's may deposit them immediately for payment at the patron's bank. This characterization is belied, however, by the fact that they require a credit application before markers are dispensed.

■ The trustee has met all of the elements of section 547(b). There is no question that the debtor was insolvent during this 90-day period, that the payment was made for the benefit of Harrah's within ninety days of the filing of the petition, and that Harrah's received full payment of this debt as a result of the transfer, more than it would receive as an unsecured creditor in this chapter 7 bankruptcy case. Although Harrah's asserts that the payment was not made on an antecedent debt, there is no genuine basis for this assertion. Because the markers were obtained some thirty days prior to their payment, the debt was incurred before the preferential transfer and is, therefore, payment on an antecedent debt. *Cf. Jones v. Central States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 329 (8th Cir.1997) (defining antecedent debt).

## II. *Section 547(c): Affirmative Defenses*

■ If a payment is a preference under section 547(b), it may be excepted from avoidance if one provision or exception under section 547(c) applies. *Union Bank v. Wolas*, 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). Harrah's asserts that the trustee may not recover the $50,000 as a preference because it is protected by the new value it contemporaneously exchanged for the transfer, the transfer occurred in the ordinary course of business, and that subsequent to the transfer it gave new value to or for the benefit of the debtor on an unsecured basis. 11 U.S.C. § 574(c)(1), (2), (4). The creditor or transferee bears the burden of proving any affirmative defenses it raises pursuant to section 547(c). *Official Plan Committee v. Expeditors Int'l of Washington, Inc. (In re Gateway Pacific Corp.)*, 153 F.3d 915, 917 (8th Cir.1998).

The Bankruptcy Code provides in pertinent part:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contempora-neous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. §§ 547(c)(1), (c)(2), (c)(4).

### A. *New Value Exceptions: Sections 547(c)(1), (4)*

■ To the extent that a creditor extends contemporaneous or subsequent unsecured new value that remains unpaid, the trustee or debtor-in-possession may not avoid the transfer. *Charisma Investment Co. v. Airport Systems, Inc. (In re Jet Florida System, Inc.)*, 841 F.2d 1082 (11th Cir.1988). Section 547(c)(1) requires that the transfer be intended by both parties to be a contemporaneous exchange for new value, that in fact it was substantially contemporaneous, and that the exchange was for new value.

*Official Plan Committee v. Expeditors Int'l of Washington, Inc. (In re Gateway Pacific Corp.)*, 153 F.3d 915, 918 (8th Cir.1998). Similarly, Section 547(c)(4) contains a separate "new value" exception addressing the situation wherein new value is extended subsequent to the transfer but occurring during business relationships in which credit is continually extended on an open account. *See generally 4 Collier on Bankruptcy*, § 547.12 (15th Ed.1994). Section 547(c)(4) requires that the creditor give new value that is not secured by an unavoidable security interest and that the debt remain unpaid.

■ In this case neither exception applies for the simple reason that no *new* value was given, either contemporaneously or subsequently as contemplated by the statute. Armstrong obtained credit on October 12 and 13, 1995, and on November 15 and 16, 1995, more than thirty days later, it was paid. There occurred no intervening extensions of credit or any other business transaction between Harrah's and the debtor. Harrah's error throughout is its focus upon the *issuance* of the markers as the transfer sought to be avoided. The transfer sought to be avoided is the *payment* on the markers.

Even if the issuance of markers is analogized to the issuance of a check, as maintained by Harrah's, the fact that Harrah's, by agreement, held the markers for thirty days obviates any assertion that the transaction was either contemporaneous or intended to be contemporaneous. In focusing upon the initial extension of credit (or, as asserted by Harrah's, upon the issuance of a check), Harrah's fails to address the separate requirement that the *transfer, i.e.,* the payment, be contemporaneous, or substantially contemporaneous, with the initial grant of *value.* The mere fact that Armstrong was given value, in the form of the ability to gamble, at the time he signed the markers, *see In re Chomakos*, 69 F.3d 769 (6th Cir.

1995), does not make the transfer, thirty days later, contemporaneous or even substantially contemporaneous. *See generally Union Bank & Trust Co., Erie v. Baker (In re Tressler)*, 771 F.2d 791, 794 (3d Cir.1985); 5 *Collier on Bankruptcy* ¶ 547.04[1] (15th rev. ed.).

Finally, there is no evidence before the Court that either Harrah's or Armstrong intended the transaction to be contemporaneous. *Cf. National City Bank of New York v. Hotchkiss*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913) (passage of only a few hours between extension of credit and demand for security was preferential).[3] The initial request for fourteen days to pay the markers indicates the opposite conclusion and the subsequent agreement to extend payment to thirty days compels it. The new value exceptions simply have no applicability to the facts in this case and therefore do not preclude recovery by the trustee.

### B. *547(c)(2): Ordinary Course of Business*

Harrah's argues that no preferential transfer occurred because the payments sought to be avoided were transfers in payment of a debt incurred by the parties in the ordinary course of business or financial affairs of the debtor and the transferee and in accord with ordinary business terms.[4] Harrah's presents arguments in support of each of the elements of the ordinary course of business exception, but the transaction between it and the debtor does not fit within the context of the statute or the policies underlying the statute.

■ The purpose of the ordinary course of business exception is to leave undisturbed normal commercial and financial relationships and protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of *both* the debtor and the debtor's transferee. *In re*

---

**3.** *Hotchkiss* establishes the rule subsequently codified by 11 U.S.C. § 547(c)(1). 5 *Collier on Bankruptcy* ¶ 547.04[1][a] (15th rev. ed.)

**4.** Although Harrah's strenuously argues that it has met all three elements of the statute, its arguments are primarily limited the issuance of the credit. Harrah's presented a great deal of evidence and argument that its issuance of credit

was made in its ordinary course of business. However, Harrah's fails to adequately prove or argue that the payment by Armstrong, the transfer which is the focus of two of the three elements of the statute, was made in the debtor's ordinary course of business or in the ordinary course of the debtor's financial affairs.

*Midway Airlines, Inc.,* 69 F.3d 792, 797 (7th Cir.1995). The exception was enacted to encourage trade creditors and other suppliers to continue dealing with troubled debtors, *Johnson v. Barnhill (In re Antweil),* 931 F.2d 689, 693 (10th Cir.1991), *aff'd,* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), and to discourage unusual actions by either the creditor or the debtor, *Central Hardware Company v. Sherwin–Williams Company (In re Spirit Holding Co., Inc.),* 153 F.3d 902, 904 (8th Cir.1998); *Riske v. C.T.S. Systems, Inc. (In re Keller Tool Corp.),* 151 B.R. 912, 914 (Bankr.E.D.Mo.1993) (quoting *Union Bank v. Wolas,* 502 U.S. 151, 112 S.Ct. 527, 532, 116 L.Ed.2d 514 (1991)). Finally, because the exception is one that places a particular creditor on better footing than all creditors, the exception must be narrowly construed. *Jobin v. McKay (In re M & L Business Machine Co.),* 84 F.3d 1330, 1339 (10th Cir.1996), *cert. denied,* 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996). With these precepts firmly in mind, the Court analyzes the specific factors as established by the statute and further defined by *Jones v. United Savings & Loan Assoc. (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.),* 9 F.3d 680 (8th Cir.1993) (ordinary course of business exception contains three prongs, consisting of objective as well as subjective elements).

**(1) Debt Incurred in the Ordinary Course of Financial Affairs**

■ First, the transfer must be in payment of a debt incurred in the ordinary course of financial affairs of the debtor *and* the transferee. 11 U.S.C. § 547(c)(2)(A). This subparagraph focuses upon the nature of the original transaction creating the debt and whether it was ordinary. Harrah's presented substantial evidence that, from its perspective, it extended credit to the debtor in the same manner it extends credit to other gamblers. Harrah's obtained an application from the debtor, required bank and income information, examined particular credit reports, and obtained information on Armstrong's gambling habits and history from other casinos. The issuance of markers as a form of credit appears to be a standard in the industry, whether at the local or national

level. To that extent, the debt was incurred in the ordinary course of the financial affairs of the transferee—Harrah's.

■ This does not end the analysis under section 547(c)(2)(1), however, inasmuch as the statute also requires that the credit be extended in the ordinary course of the debtor's financial affairs. *See Matter of Milwaukee Cheese Wisconsin, Inc.,* 112 F.3d 845, 848 (7th Cir.1997); *DuVoisin v. Coker (In re Southern Indus. Banking Corp.),* 189 B.R. 697 (E.D.Tenn.1992); *cf. Fitzgerald v. Beesley (In re Beesley),* 139 B.R. 247, 248 (Bankr.D.Idaho 1992) (sale of boat not within ordinary course of debtor's business since the debtor's business was the sale of mobile homes). While it is true that the debtor gambled heavily and often in a futile attempt to cover his illegal activities, his proclivity to gamble does not render his obtaining a marker from the casino in order to gamble within the "ordinary course of business or financial affairs of the debtor." Armstrong, an attorney, was not a "professional gambler." Rather, he gambled first for recreation and finally through desperation such that the gambling activities, and obtaining credit to conduct those activities, were clearly outside his ordinary course of financial affairs. Further, although extensions of credit for usual consumer and business goods and services may in some circumstances fall within the ordinary course of business exception, *see e.g., Fidelity Sav. & Inv. Co. v. New Hope Baptist,* 880 F.2d 1172 (10th Cir.1989), gambling by a nonprofessional does not qualify under the concept of ordinary business or financial affairs.

**(2) Payment Made in the Ordinary Course**

■ The transfer or payment must be made in the ordinary course of business or financial affairs of both the debtor and the transferee. 11 U.S.C. § 547(c)(2)(B). This subjective element focuses on whether the payment was made in the ordinary course of the business affairs of this debtor and creditor. *Central Hardware Company v. Sherwin–Williams Company (In re Spirit Holding Co., Inc.),* 153 F.3d 902, 904 (8th Cir. 1998). In order to comport with both the

language of the statute and its purpose, the primary focus is upon whether the transaction is consistent with prior dealings between the parties. *Cf. McCarthy v. Navistar Financial Corp. (In re Vogel Van & Storage, Inc.)*, 210 B.R. 27, 34 (N.D.N.Y.1997), *aff'd*, 142 F.3d 571 (2d Cir.1998). There were no transactions between Harrah's and Armstrong prior to the October gambling trip.[5] Although there is authority that the lack of such prior transactions renders the exception inapplicable, *see, e.g., Miller v. Kibler (In re Winters)*, 182 B.R. 26 (Bankr.E.D.Ky.1995); *Brizendine v. Barrett Oil Distributors, Inc. (In re Brown Transport Truckload, Inc.)*, 152 B.R. 690 (Bankr.N.D.Ga.1992), the better view is that, although relevant, the lack of any history between the parties is not necessarily determinative,[6] *see, e.g., Gosch v. Burns (In re Finn)*, 909 F.2d 903, (6th Cir. 1990); *Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.)*, 220 B.R. 1005, 1021 (10th Cir. BAP 1998). Rather, a factual analysis should be conducted to determine whether the transaction would be one that would have occurred in the ordinary course of the financial affairs of a borrower or debtor in the same position. *Finn*, 909 F.2d at 908.

The length of the relationship between the parties is one of the factors to be considered in determining whether the transfer was subjectively ordinary between the parties. *Iannacone v. Klement Sausage Co. (In re Hancock–Nelson Mercantile Co.)*, 122 B.R. 1006, 1013 (Bankr.D.Minn.1991); *see Central Hardware Co. v. Walker–Willimas Lumber Co. (In re Spirit Holding Co.)*, 214 B.R. 891, 897 (E.D.Mo.1997), *aff'd*, 153 F.3d 902 (8th Cir.1998).[7] When there are no prior transactions with which to compare, the court may analyze other indicia, including whether

the transaction is out of the ordinary for a person in the debtor's position, *Finn*, 909 F.2d 903, or whether the debtor complied with the terms of the contractual arrangement, *Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.)*, 220 B.R. 1005, 1021 (10th Cir. BAP 1998), generally looking to the conduct of the parties, *see Remes v. ASC Meat Imports, Ltd. (In re Morren Meat and Poultry Co.)*, 92 B.R. 737, 741 (W.D.Mich. 1988), or to the parties' ordinary course of dealing in other business transactions, *Riske v. C.T.S. Systems, Inc. (In re Keller Tool Corp.)*, 151 B.R. 912, 914 (Bankr.E.D.Mo. 1993).

The transfer of funds in this case was not ordinary in any way, much less within the ordinary course of the business or financial affairs of the debtor for essentially the same reasons discussed under the first prong of the exception: the payment of his gambling debt was not within the debtor's ordinary financial affairs. *See Matter of Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 848 (7th Cir.1997). Moreover, Armstrong caused the bank to hold the markers and not pay them until Armstrong had time to obtain a loan to deposit funds in his account to cover the markers. *Cf. In re Vogel Van & Storage*, 210 B.R. at 37 ("[T]he state of mind of the debtor is determinative.").

The controller of Harrah's, through his deposition, testified regarding the casino's general procedures. A fourteen or thirty day hold on a marker meant to him that he "reserve[d] the right to hold that marker for up to 30 days" before depositing it. He also had the ability or authority to deposit it the next day if he thought the circumstances warranted. Whether the marker was held or

**5.** Armstrong made two subsequent trips to Harrah's. On November 19, 1995, he obtained eight markers worth $27,000 and won $52,200. On December 15, 1995, he took out thirteen markers totaling $50,000. The markers outstanding from the December trip are unpaid. To the extent that subsequent transactions between the parties may be relevant, these facts militate against a finding of any ordinary course of business between the parties.

**6.** However, the fact that there is a long-term relationship has an affect upon the measure of

proof required for section 547(c)(2)(C). *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 224–25 (3d Cir.1994).

**7.** As one court has noted, the longer the relationship between the parties, the more the transaction may deviate from the objective industry standard. *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 224–25 (3d Cir.1994).

deposited depended upon the circumstances regarding the particular gambler and the judgment of Harrah's after applying those facts. For example, if a customer had markers outstanding, but, upon winning did not exchange the markers and took cash out of the casino, the controller could elect to immediately present the markers for payment rather than holding them pursuant to any agreement. In any event, whether to hold the markers or not, was at the sole discretion of the casino.

Harrah's has not directed the Court's attention to any particular pattern or consistent course of dealing, either between the parties or for that matter between Armstrong and other casinos which would place this transaction within the ordinary course of financial affairs of this debtor, an essential element of proof under section 547(c)(2)(B).

### (3) *Transfer Made According to Ordinary Terms*

█ The transfer must be made according to ordinary business terms. 11 U.S.C. § 547(c)(2)(C). This is an objective element which focuses on industry practice. The payment must be ordinary in relation to the standards prevailing in the relevant industry. *U.S.A. Eureka Springs,* 9 F.3d at 684. Two controllers, including the controller from Harrah's, testified that there is no industry standard. While this clearly militates in favor of a finding that the proof is not or cannot be met, the Court will examine the bit of proof offered. The testimony at trial concerned three of the eight casinos in the Mississippi–Louisiana area. Harrah's casino controller testified that two of the casinos held markers for only seven days in contrast to Harrah's policy of holding markers for fourteen to thirty days. The controller of Harrah's Shreveport Casino also testified, through deposition, as to the lack of industry standard. It appears from the testimony, however, that the period of time markers are held depends greatly upon the particular customer, the amount of credit line, and the local gaming regulations. Apparently, under Mississippi regulations, casinos are not permitted to hold the markers for more than thirty days. To the extent there is evidence

from which the Court can make any determination of any standard in the industry, local or otherwise, it appears that seven days is the norm, rather than fourteen or thirty. Indeed, thirty is the maximum allowable by law and, while many of the other casinos keep the disposition period within a quarter of that time, Harrah's regularly permits a full fifty to one hundred percent of the allowable period. In any event, from the evidence presented, it appears that the industry standard, whether examined locally or nationally, although limited by regulation, is actually based solely upon subjective factors such as the wagered amounts, the extent of the credit line, and informal conversations with particular customers. There is insufficient evidence before the court of the existence of any "prevailing practice among similarly situated members of the industry facing the same or similar problems." *U.S.A. Inns of Eureka Springs,* 9 F.3d 680, 685.

The court does not believe, however, that to the extent that ordinary business terms may have been presented, that Harrah's were so idiosyncratic or extraordinary as to fall outside the scope of the statutory provision. Indeed, to the extent that the casinos are operating under pervasive and strict state regulations, the regulations could, arguably, constitute the industry standard within a specific geographic location. Since, however, Harrah's cannot demonstrate the first two elements of the exception, the finding that Harrah's has failed to demonstrate that it's practice comports with ordinary business terms, is not necessary to the determination.

### III. *CONCLUSION*

█ The purpose of the section 547 avoidance provision of the Bankruptcy Code is to place all unsecured creditors on an equal basis for purposes of distribution of the debtor's assets. *McCuskey v. Nat. Bank (In re Bohlen Enterprises, Ltd.),* 859 F.2d 561, 566 n. 10 (8th Cir.1988) ("[T]he provision facilitates the prime bankruptcy policy of equality of distribution among creditors of the debtor."); *accord Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044, 1047 (4th Cir. 1994). Within the preference period, the 90–day time period Congress deemed appropri-

ate for equalizing creditors, Harrah's received full payment of the amount Armstrong owed for an antecedent debt. No one argues that this amount is more than it would have received in a case under chapter 7. Rather, Harrah's argues its transaction with the debtor is excepted from the equalizing provision of the statute. The exceptions which protect contemporaneous or ordinary business transactions, however, simply do not apply to the facts in this case. Accordingly, the trustee is entitled to avoid this payment and recover $50,000 for the benefit of all the unsecured creditors.

■■■■ Finally, the trustee seeks prejudgment interest. In order for the trustee to recover prejudgment interest, the application of the elements of this statutory action must be ascertainable. The defendant must also lack a worthy defense, which would indicate that the trustee's recovery was probable. If these circumstances exist, the trustee is entitled to prejudgment interest on his recovery in the preference action because the trustee (estate) has been deprived of the use of the funds. *See generally Wickham Contracting Co. v. Local Union No. 3,* 955 F.2d 831, 833–36 (2d Cir.1992) (discussion of history and application of awards of prejudgment interest). Prejudgment interest may be awarded to compensate a party for the denial of the use of funds, *West Virginia v. United States,* 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), or where the defendant could have ascertained the amount of the preferential payment without a judicial determination, *i.e.,* if the claim was liquidated, *Bank of Mulberry v. Fireman's Fund Ins. Co.,* 720 F.2d 501, 503 (8th Cir.1983); *United States v. Dimarco Corp.,* 985 F.2d 954, 959 (8th Cir.1993); *Jacoway v. Anderson (In re Ozark Restaurant Equip. Co.),* 96 B.R. 187, 192 (Bankr.W.D.Ark.1988). The court believes the defendant was not wholly lacking in a worthy or credible defense. Its arguments regarding the ordinary course of business exception were not wholly without merit, albeit unavailing under the circumstances. A trial was necessary. Accordingly, it is

**ORDERED** that the trustee is entitled to judgment on Count I of the complaint, 11 U.S.C. § 547, plus interest and costs of the action according to law. Fed.R.Civ.P. 7054(b).

**IT IS SO ORDERED.**

### ORDER DENYING MOTION TO RECONSIDER

■■■ THIS CAUSE is before the Court upon the plaintiff's Motion to Reconsider, timely filed on February 3, 1999, after entry of the judgment in favor of the plaintiff on the trial of the Complaint to Recover Money or Property. The trustee's complaint sought recovery of funds from a casino pursuant to either Bankruptcy Code sections 547, 548(a)(1) or Arkansas Code § 16–118–103. In the findings of fact and conclusions of law entered on January 28, 1999, the Court determined the debtor's transfers to the defendant casino to be preferences to which the section 547(c) defenses were unavailable and awarded the judgment to plaintiff pursuant to section 547. Accordingly, the Court did not address the merits of the second and third counts of the complaint. The trustee plaintiff moves for reconsideration on the grounds that, should the defendant appeal and be successful on appeal, the trustee will have lost the right to argue to an appellate court the merits of his right to recover under either Count II or III.

The Court does not believe that the plaintiff's statement of the law is necessarily correct, but, in light of the dearth of case authority, his concern is understandable. Under some circumstances, a prevailing party may have justification for filing a cross appeal to protect an interest that might otherwise be adversely affected by the disposition of the appeal. However, in this instance, it does not appear that the trustee will be adversely affected by an appeal, whether successful or unsuccessful, such that the motion will be denied.

■■■ Amendment of the findings is unnecessary for several reasons. First, there is no requirement that a court make findings on a particular issue if other issues are dispositive of the case. *Fields Engineering & Equipment, Inc. v. Cargill, Inc.,* 651 F.2d 589, 594 (8th Cir.1981) (since trial court found that a

breach of contract existed, there was no requirement that it address the quantum meruit count). This rule obviously contemplates the possibility that a subsequent reversal requires remand for further findings. Second, even were the Court to make findings of fact and conclusions of law with regard to the remaining counts, and were those findings made in favor of the defendant, the plaintiff trustee is not necessarily entitled to appeal those findings, having won the adversary proceeding on his first count.[1] *See Native Village of Tyonek v. Puckett,* 890 F.2d 1054, 1055–56 (9th Cir.1989), *cert. denied,* 499 U.S. 901, 111 S.Ct. 1097, 113 L.Ed.2d 208 (1991) (defendants who obtained dismissal did not have standing to cross appeal).

Third, if an appellate court were to reverse this Court's decision on Count I, the appellate court has the authority to remand for determination of Counts II and III. *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Assoc.,* 8 F.3d 760, 769 (11th Cir.1993) ("Thus, since it had already ruled in cosignors' favor, the district court did not need to, and therefore did not, address these [alternative] claims. This [appellate court] decision, however, makes these issues once again relevant.... [T]his court finds it appropriate to remand these questions to the district court for further proceedings as necessary."). Indeed, that appears to be the general procedure. *See, e.g., id; Centres, Inc. v. Town of Brookfield,* 148 F.3d 699 (7th Cir.1998); *Bath v. Nat'l Assoc. of Intercollegiate Athletics,* 843 F.2d 1315 (10th Cir. 1988).

Finally, should this Court grant this motion and decide Count II and III on the merits adverse to the trustee, and the findings under Count I are upheld, an appeal by the trustee of Counts II and III would cause a needless expense of resources by this court, the appellate court, and all parties due to the costs of copying the voluminous records, briefing of arguments, and review by the appellate court. Such costs are simply wasteful. If remand is made, this Court can then enter its findings at that time. Moreover, where, as here, remand may be had, an appeal solely to avoid the risk of future pre-

clusion invites a decision that has no real consequences and thus may be distorted.

The Court believes that the better course is to deny the motion. In this manner, the trustee is protected. He may appeal the denial of this motion, leaving solely an alternative and minor procedural issue for the appellate court. If this Court's decision on Count I is upheld, the parties have only addressed a minor procedural issue and neither the parties nor the appellate court have had to expend resources on the merits of Counts II and III. If this Court's decision on Count I is reversed, then the appellate court has the authority and, arguably, the duty, to remand the matter for determination of Counts II and III. For the foregoing reasons, it is

**ORDERED** that the plaintiff's Motion to Reconsider, filed on February 3, 1999, is Denied.

**IT IS SO ORDERED.**

---

1. Of course, the trustee may appeal the denial of his request for prejudgment interest.